70517. BRICKS v. METRO AMBULANCE SERVICE, INC. et al.
(338 SE2d 438)

BIRDSONG, Presiding Judge.

Holley Bricks, as Administratrix of her grandmother's estate, sued Metro Ambulance Service, Inc. and James Leibel for the theft of her grandmother's large diamond ring while the grandmother, Ann Cowan, was being transported from her home to West Paces Ferry Hospital, where she died. The evidence shows the ambulance trip took one minute or less; Ann Cowan's son, who was with her when the ambulance arrived, testified she wore the ring when she was taken to the ambulance. The admitting nurse at the hospital testified Ann Cowan wore no such large ring when the nurse administered IV solutions to Ann Cowan, but the nurse admitted she might have missed

seeing the ring. In the ambulance, Ann Cowan was tended by one attendant, defendant James Leibel, the other Metro employee being engaged in driving the vehicle.

Defendant Leibel failed to answer the lawsuit and was thus in default; but Metro Ambulance contested the suit. The jury returned a verdict against Leibel in the amount of $5,000 and in favor of Metro Ambulance. On appeal, Holley Bricks contends the trial court erred in failing to decide as a matter of law, and so charge, that an ambulance is a common carrier and hence Metro Ambulance owed the duty of extraordinary care to its passengers; and that the ambulance owner also owed the duty of extraordinary care to Mrs. Cowan as a provider of emergency health care. *Held*:

1. The trial court charged the jury, inter alia, that it could determine whether Metro Ambulance was or was not a common carrier; that (at the same time) a carrier of passengers owed the duty of extraordinary care and is not liable beyond that; that a common carrier is bound to use extraordinary diligence and in cases of loss the presumption of law is against it and no excuse will avail it unless the loss was occasioned by the act of God and public enemies; and that liability of a common carrier for assault on a passenger by an employee does not depend upon the employee's scope of employment but is based on the carrier's broad duty to its passengers, and (at the same time) a master is liable for an employee's wilful acts within the scope of his employment while acting within the scope of his employment and in the prosecution of the employer's business, even though not done at the employer's direction or command; and (at the same time) if a servant injures another negligently or purposefully when "he was not engaged in the master's business," his negligence or conduct would not be imputable to the master, and if the tort had no reference to or connection with the master's business the master would not be liable; that the test of the master's liability for assault of the servant is "not whether the act was done during the existence of the employment but whether it was done in the prosecution of the master's business, and the relation of master and servant is suspended, so as to make the servant alone liable, if the servant steps aside from his master's business, for however short a time, to do an act not connected with such business. . . ."

The trial court also charged: "This action has been brought against two defendants. If it is found that both defendants have violated a duty to the plaintiff, the plaintiff may recover damages. . . ."

This jury charge was error.

We hold that an ambulance is a common carrier. "A common carrier is one that undertakes to carry, and holds himself out as ready to receive for carriage, goods for hire, which he is accustomed to carry, for all people indifferently so long as he has room. Such undertaking

may be evidenced by the carrier's own notice, or practically by a series of acts, by his own habitual continuance in his line of business. (a) Whether a person is a common carrier or a private carrier depends upon the facts . . . first, whether it is public business or employment, and whether the service is to be rendered to all indifferently; and, second, whether one has so held himself out as so engaged as to make him liable for a refusal to accept the employment offered." *McIntyre v. Harrison*, 172 Ga. 65 (5) (157 SE 499).

"A private carrier is one who, *without being engaged in the business of carrying as a public employment*, undertakes to deliver goods in a particular case for hire or reward. He may carry or not as he deems best. He is but a private individual, and is invested, like other private persons, with the right to make his own contracts. 10 C. J. 38 (§ 4) A. If a carrier does not deal with the public indiscriminately as a matter of routine, but in effect makes an individual bargain in each case, this course of business tends to show that the service is upon a private basis." (Emphasis supplied.) Id. pp. 83-84.

OCGA § 46-1-1 (4), in effect when this ambulance conveyed Mrs. Cowan, defines common carrier as "a person who undertakes to carry and holds himself out as ready to receive for carriage, goods for hire which he is accustomed to carry or passengers for hire without discrimination as long as he has room." See § 46-1-1 (9) for definition of "passenger."

Under these statutory definitions and the standards described in *McIntyre*, supra, an ambulance is a common carrier so long as it undertakes to carry sick, injured, or disabled persons indiscriminately and indifferently, so as to make it liable for refusal to accept the employment offered. "If he refuses to carry, he is liable to be sued, and to respond . . . to the person aggrieved; and this is perhaps the safest test of his character." *McIntyre*, supra, p. 82. In the *usual* case, as in this one, an ambulance is not a "private carrier" because it may not "carry or not as [it] deems best." Id. p. 83. It deals with the public "indiscriminately as a matter of routine." Id. It does not reserve "the right of accepting or rejecting [the public's] offers . . . for carriage," and is not so "guided in [its] decision by the attractiveness or otherwise of the particular offer." Id. p. 84. The fact that its carriage is limited by necessity and nature to a certain area or class, i.e., sick or injured persons, does not change its status as a common carrier. See *Eason v. Crews*, 88 Ga. App. 602 (1) (77 SE2d 245); *Sheffield v. Lovering*, 51 Ga. App. 353 (1) (180 SE 523). Nor does it matter, in exacting the standard of care of a common carrier, what sort of conveyance is used. Id. p. 354. Nor does the fact matter that the conveyance is not subject to control of the Georgia Public Service Commission under OCGA § 46-2-20 (a), but is as provided by law made subject to the Department of Human Resources. OCGA § 31-11-1.

We specifically recognize that in many instances in this state there are ambulances which are not strictly required by law or regulation to serve particular calls, but instead operate independently on a competitive basis. A literal application of the aforementioned "test" of basing common carrier status upon whether the carrier must respond to calls indifferently according to its ability or inability to carry, does not serve the object of the law in the case of such "competitive" ambulance service. Rather, we see the object of the law in the described "test" for determining common carrier status in the case of ambulance service as being, to a large degree, actually the protection of *the individual who must accept carriage from a particular carrier* who is *in the business of public carriage*. These ambulances are "engaged in the business of carrying as a public employment." *McIntyre*, supra. Moreover, the ambulance is unique as a carrier having exclusive custody of persons, with their property, who are helpless to protect themselves. No individual is more at the mercy of a carrier than a person dying, or ill or injured enough to require carriage. In holding that this kind of ambulance is a common carrier, we decline to discriminate against such person merely because the ambulance he is forced to ride in was not forced to take him.

With regard to actions for *negligence*, a common carrier is held to a standard of extraordinary diligence, and in cases of loss, the presumption is against the common carrier, and no excuse will avail it unless the loss was occasioned by the act of God or public enemies. OCGA § 46-9-1. The cases have generally assumed this code section applies only to the carriage of goods. This code section makes the common carrier the insurer of what it carries, except for loss by act of God and public enemies. *Central R. Co. v. Hasselkus & Stewart*, 91 Ga. 382 (3) (17 SE 838); *McIntyre*, supra, p. 82.

On the other hand, in the case of the ordinary conveyance of passengers, a common carrier is held to the standard of extraordinary diligence to protect "the lives and persons of his passengers but is not liable for injuries to them after having used such diligence." OCGA § 46-9-132.

The basis for the distinction between liability for loss of goods and for injury and insult to passengers is expressed in *Humphrey v. Merchants &c. Co.*, 38 Ga. App. 578, 579 (114 SE 354), where a steamship passenger's personal effects were stolen from his cabin while he slept. There we said: "Whether the defendant be treated as an innkeeper or as a common carrier of goods, it would at least be responsible to the plaintiff for the loss of such articles as the passenger might be reasonably expected to carry on his person, where the loss occurred as a result of the defendant's negligence. [Cit.] Under the rule laid down by the courts of New York, the owner of a steamship is responsible for the personal baggage of a passenger, except

where the loss thereof is caused by the act of God or the public enemies. [Cit.] The weight of authority, however, appears to be different, and in most States where the question has been decided it is held that *unless the baggage has been delivered into the exclusive control of the carrier's officers or agents it is not liable,* unless the loss was due to the carrier's negligence. [Cits.]" (Emphasis supplied.)

It appears therefore that where *goods* are entrusted to the sole care of the carrier, it should be liable for their loss as an insurer (*Central R. Co. v. Hasselkus & Stewart,* supra; *Humphrey,* supra); but where the passenger has a role to play in the protection of his life and person, and where he has control of his personal effects, the duty and obligation of the carrier lessens proportionately and it cannot be held liable as an insurer. 14 AmJur2d, § 1281, pp. 663-664. See also the line of cases involving Pullman sleeping cars as private carriers, e.g., *Pullman Co. v. Green,* 128 Ga. 142, 145 (57 SE 233); *Pullman Co. v. Schaffner,* 126 Ga. 609 (55 SE 933); *Pullman's Palace Car v. Harvey,* 101 Ga. 733, 736 (28 SE 989). See esp. *Pullman's Palace Car Co. v. Hall,* 106 Ga. 765 (32 SE 923), wherein the Supreme Court went to great effort to define the type of "loss" for which the private carrier would be liable because of lack of reasonable care. The distinction ultimately was made that in a private sleeping car the passenger's effects were not given into the "exclusive custody" of the carrier where the passenger retained possession of them (p. 771); and it was also alluded to that open sleeping berth arrangements made protection more difficult (p. 770).

There are very few reported cases which have examined the duty of an ambulance, as common carrier, with regard to the protection of its passengers and their effects. See, e.g., *Nazareth v. Herndon Ambulance Svc.,* 467 S2d 1076. With respect to the question of degree of responsibility owed to its passenger, the ambulance is sui generis as a carrier in that the ambulance carrier has *exclusive control* of both an ill and thus a helpless passenger, as well as his personal effects. Clearly, the case of personal effects accompanying an ambulance passenger is not precisely covered by § 46-9-1, which holds a common carrier liable (as an insurer) for "loss," but which is usually understood to mean loss of goods shipped. And clearly, § 46-9-132 regarding the carrier's duty of extraordinary diligence to protect the "lives and persons" of passengers is even less pertinent to passengers who are helpless to protect themselves or unable to play a role in contributing to their own safety. Both the passenger and his effects are in the exclusive control of the ambulance carrier and its employees, and their carriage does not confortably fit either § 46-9-1 or § 46-9-132. However, the *rationale* of these code sections, as expressed above, centers about the issue of whether the carrier has exclusive custody, and this rationale leads us inexorably to the conclusion that in the sui generis

case of the ambulance where the carrier has exclusive control of a sick, injured or dying person and of his personal effects, it should be liable for loss during the time of carriage of such goods and for personal injury, except for acts of God and public enemies. Every consideration of the peculiar circumstances of an ambulance passenger and the carrier's control leads us irresistably to the conclusion that an ambulance carrier should not bear less responsibility for the persons and personal effects of its passengers, whom we are justified in assuming to be non compos corporis, than other common carriers bear for the loss of the smallest box of paperclips under § 46-9-1.

While we recognize that the principles discussed herein above generally relate to a common carrier's liability for injury to its passengers' lives and persons and loss of their personal effects due to negligence of the carrier or its employees in the execution of the carrier's business; nevertheless, because of the uniqueness of an ambulance as a common carrier and the total and exclusive control exercised over the person and personal effects of the passenger-patient, shown hereinafter, the underlying principles of absolute liability properly are discussed as necessary to an understanding of the ruling of this court relating to the ambulance's posture as a common carrier in the face of a wilful tort.

As regards wilful torts, a common carrier owes a duty to passengers not only to protect their lives and persons from insult and injury and their personal effects from loss, but it owes a special duty to protect its passengers from injury, violence, insult and ill-treatment at the hands of its servants, who are in charge of or connected with the carriage. This special duty is based upon the contract between the parties. *Savannah, Fla. &c. R. Co. v. Quo*, 103 Ga. 125, 126 (29 SE 607). " 'A carrier is bound to discharge the implied duty, arising out of its contract and imposed by law, that its passengers shall be protected from injury by its servants and shall not be willfully insulted and harmed by them; and if it commits the discharge of this duty to an employee, it may well be held to do so at its peril, notwithstanding the exercise of care on its part in selecting its servants. Either the company or the passenger must take the risk of infirmities of temper, maliciousness, and the misconduct of the employees . . . and to whom it has committed the discharge of its duty to protect and look after the safety of passengers.' " *Mason v. Nashville &c. R. Co.*, 135 Ga. 741, 759 (70 SE 225).

A common carrier is bound to use extraordinary diligence to protect its passengers not only from injury by third persons (*Yellow Cab Co. v. Carmichael*, 33 Ga. App. 364, 368 (126 SE 269)), but for wilful and wanton acts of its own servants in its employment. It is absolutely liable, even if the servant was not acting in the interest of the employer in the particular act. *Central of Ga. R. Co. v. Brown*, 113

Ga. 414, 416 (38 SE 989); *Yellow Cab Co. v. Carmichael*, supra. The special relation between carrier and passenger gives rise to this unique liability for acts of the carrier's servants that is distinct from the usual liability of a master as respondeat superior for his servant's acts, and the two should not be confused. *Mason v. Nashville &c. R. Co.*, supra at 745. It is liability which goes even beyond the use of due care, or even extraordinary care, in selecting the servant. Id. p. 749. While some courts have held (as the trial court charged in this case) that the master is not liable for the wilful acts of a servant by which he in his personal malice or wilfulness ceases for a time being to act in the master's service (see *Nazareth v. Herndon Ambulance Svc.*, supra), the Georgia Supreme Court long ago "exploded" that argument. *Central of Ga. R. Co. v. Brown*, supra, pp. 416-417; *Frazier v. Southern R. Co.*, 200 Ga. 590, 594 (37 SE2d 774). The master is liable for the torts of his servants committed in the course of his employment even though they be unexpected and wilful acts. Id. Moreover in this state, a *carrier* owes a special duty to its passengers that is not dependent upon whether the servant acted in the scope of his employment, but is based upon its broad duty as a common carrier to protect its passengers. *Southeastern Greyhound Corp. v. Graham*, 69 Ga. App. 621 (26 SE2d 371). Surely no passenger is more deserving of this broad duty than a helpless ambulance passenger.

The Supreme Court in *Savannah, Fla. &c. R. Co. v. Quo*, supra, pp. 126-127, confronted a case of sexual assault upon a train passenger, but we find its language particularly apt in this case of alleged assault and theft by an ambulance attendant upon a sick or dying ambulance passenger: " 'In respect to [such] passengers, the case of the master is one of peculiar responsibility and delicacy. Their contract with him is . . . a stipulation, not for toleration merely, but for respectful treatment, for . . . decency of demeanor . . . [and] for that attention which mitigates evils without reluctance, and that promptitude which administers aid to distress. In respect to [such passengers], it proceeds yet farther; it includes an implied stipulation against obscenity . . . and against that wanton disregard of the feelings which aggravates every evil, and endeavors by the excitement of terror, and cool malignity of conduct, to inflict torture upon susceptible minds.' "

Our courts have applied the rule making the carrier absolutely liable for the wilful tort of its servant against a passenger, even where the carrier was a private carrier and thus held only to the duty of reasonable care for the passenger's protection against the carrier's negligence. *Pullman's Palace Car Co. v. Martin*, 95 Ga. 314 (1) (22 SE 700).

The plaintiff claimed torts of assault and robbery upon the person of Mrs. Cowan and offensive physical contact. Accordingly, the

trial court erred in failing to charge as a matter of law the ambulance was a common carrier, and in affirmatively charging principles dealing with the duty of extraordinary care by the carrier mixed with absolution from liability for the unexpected private torts of its employee, by charging variously and confusingly that Metro Ambulance would not be liable if the attendant did not act in its service or deviated from its service.

2. The trial court erred under the facts of this case in charging OCGA § 31-11-8, concerning immunity of ambulance services for good faith rendition of emergency care, because liability in this case was not founded upon the rendition of health care but was based upon the intentional torts of assault and robbery.

3. Under the evidence, Metro Ambulance is not, contrary to Bricks' contention, liable as a matter of law for the disappearance of Mrs. Cowan's ring unless the jury finds the ring disappeared while it and Mrs. Cowan were in Metro's custody. There is some evidence from which the jury might find that it was not proven to a preponderance of evidence that the ring was not on Mrs. Cowan's hand when she arrived in the hospital.

4. The verdict against Leibel by virtue of his default on the issue of the theft and assault, does not bind Metro as liable; for Metro's liability upon the question of his actual theft was a jury issue. *Peek v. Southern Guaranty Ins. Co.*, 240 Ga. 498, 499 (241 SE2d 210). In view of the reversal, we do not determine whether the verdict for $5,000 against Leibel was within the range of evidence offered by the appellant.

*Judgment reversed. Sognier, J., concurs. Carley, J., concurs in the judgment only.*

### On Motion for Rehearing.

On motion for rehearing, Metro contends it is not a common carrier because it "carries or does not carry patients, as it deems best" and it "reserves the right of accepting or rejecting patients."

A close examination of the seminal case, *McIntyre v. Harrison*, 172 Ga. 65 (5), 82-84 (157 SE 499), reveals that the "test" of common carrier status relied upon here by Metro Ambulance is not an absolutely rigid criteria, but the determination "depends upon the facts" (id. p. 83) for "[t]he courts do not seem to have been able to establish some simple test by which it can be determined . . . whether a man is a common or a private carrier." Id. p. 84. "A private carrier is one who, *without being engaged in the business of carrying as a public employment*, undertakes to deliver goods in a particular case for hire or reward." Id. p. 83. (Emphasis supplied.) Clearly the ambulance is "engaged in the business of carrying as a public employment."

Whether it claims it can "carry or not carry as [it] deems best," the ambulance "[deals] with the public indiscriminately as a matter of routine" (id. p. 83) and does not in effect make an individual bargain in each case in the sense of having absolute freedom to discriminate. It is subject to rigid rules and coordination by the Department of Human Resources and is a part of the emergency medical systems program (EMSC). OCGA §§ 31-11-1, 31-11-2. See *Anderson v. Little &c. Funeral Home*, 242 Ga. 751, 754 (251 SE2d 250). The ambulance is coordinated by the EMSC to respond to emergency calls based upon its location, "primarily on the considerations of economy, efficiency, and benefit to the public welfare." OCGA § 31-11-3 (c). "[I]t is the public policy of this state . . . that such programs shall be accomplished in a manner that is coordinated, orderly, economical, and without unnecessary duplication of services and facilities." OCGA § 31-11-1 (b). We doubt seriously if upon this elaborate system governing ambulances the ambulance could with impunity arbitrarily or whimsically reject a call "whether his vehicles are full or empty, being guided in his decision by the attractiveness or otherwise of the particular offer." *McIntyre*, supra, p. 84. "[T]his is perhaps the safest test of [its] character [as common carrier]." Id. p. 82.

The ambulance is routinely engaged in the business of public carriage of persons who generally have no choice in the matter. This, more than the degree of choice enjoyed by the carrier, makes the carriage contract public in nature and not private or on an individual basis. Id. pp. 83-84. Moreover, regardless of the characterization of the carrier as common carrier, the fact that it has exclusive control and custody of the person and his property entitles him to protection of extraordinary care.

*Motion for rehearing denied.*

DECIDED OCTOBER 30, 1985 —
REHEARING DENIED NOVEMBER 27, 1985 — ▮

*Mark S. Gannon, Richard G. Farnsworth*, for appellant.
*Marston C. Brown*, for appellees.