73269. SASSER et al. v. MIXON CONTRACTING, INC.
73270. MIXON CONTRACTING, INC. v. PICKERING
CORPORATION N.V. et al.
73271, 73272. PICKERING CORPORATION N.V. v. MIXON
CONTRACTING, INC.; and vice versa.
73273. MIXON CONTRACTING, INC. v. HERITAGE REALTY
COMPANY, INC. et al.

(353 SE2d 525)

BIRDSONG, Chief Judge.

Mixon Contracting, Inc. sued Pickering Corp. (the owner of a Piggly-Wiggly store in a mall), Heritage Realty Company, Inc. (the manager of the shopping mall property) and Robert A. Sasser (the president of Heritage), for breach of contract and fraudulent misrepresentation in the acceptance of a bid by Mixon Contracting to demolish the building, and the subsequent award of the job to another. Mixon Contracting sued for damages but first sought and obtained an injunction to prevent defendants from proceeding with demolition by the other bidder, Dixie Concrete Services. The restraining order was later dissolved for failure of notice of hearing to defendants, and existence of adequate remedy at law. Defendants Heritage Realty and Robert Sasser filed a cross-claim against Mixon Contracting for illegally obtaining an injunction and for informing the *Waycross Journal Herald* of the action "for the purpose of circulating in the community," the story of which appeared in that newspaper on the front page, all having been done with the intent to damage Heritage Realty's and Sasser's business and reputations. Heritage Realty and Sasser prayed for actual damages and punitive damages.

Motions for summary judgment were filed by all. The trial court granted partial summary judgment to Mixon Contracting on the counter-claims of Heritage Realty and Sasser, but denied summary judgment to Mixon on the issue of breach of contract; denied the motion of Pickering Corp.; and denied the motions of Heritage Realty and its president Sasser.

All parties appeal. *Held*:

1. The dispute centers on whether Sasser, the president of Heritage Realty, accepted Mixon Contracting's bid to demolish the prop-

erty. The owner set a bidding deadline of July 29, 1985. The specifications proposed two options for bidding: a base bid for demolishing the building and hauling away the rubble; and as an alternative, a bid for demolishing the building and burying the rubble in a pit to be dug by the contractor in a pit area provided by the owners.

On the deadline date, Mixon, through its vice-president Roger Strickland, delivered to Sasser at his office a written bid proposing a base bid of $39,500 for demolition and hauling away the rubble, and an alternate bid of $27,400 to demolish the property and "[b]ury all masonry rubble in a pit provided by owner within 500 feet of the existing structure." Roger Strickland testified he clearly knew and intended that Mixon, and not the owner, would dig the pit; on appeal Sasser et al. contend Mixon Contracting's bid to "[b]ury . . . in a pit provided by owner" constituted a variance and that was why it was not accepted; but there is no evidence in the record, particularly Sasser's deposition, that Mixon's language in the alternate bid was so misunderstood, nor that any issue was made of it among the parties at the time of bidding. The bid designation of a pit to be "within 500 feet" was based on Sasser's having earlier pointed out to Roger Strickland the pit area on the site plan, which Strickland then measured at around 400 feet. The $27,400 alternate bid was for "within 500 feet" and Strickland knew that if that distance was unacceptable the owner would have the option to renegotiate with another bidder. According to Strickland, Sasser had previously told Strickland he was soliciting only two contractors' bids and that if Mixon Contracting was the low bidder it would get the job; that Sasser also told him that this was really a rush job and "we've got to get going."

On Monday, July 29 while Strickland was in Sasser's office delivering Mixon's written bid, Sasser had a telephone conversation with a representative of Dixie Concrete Services, in which Dixie gave an oral bid for only the base proposal of hauling away the rubble, in the amount of $39,650, which fact Sasser disclosed to Roger Strickland. Thereupon, according to both Sasser and Strickland, Sasser said to Strickland: "It looks like you're the low bidder." And he told Strickland that Dixie had not submitted an alternate bid for burying the rubble on site because "Dixie would rather not do it that way" (although Sasser elsewhere contradicted this testimony), or, according to Strickland, "they did not want to bury it at the site." According to Strickland, Sasser then said: "I'm not sure that we can bury it at the site. . . . [I]t's too late today, but I'm going to call the architect and find out which way we can do it." Whereupon Strickland, having been told his bid for hauling away was the low bid and there was no other bid for the alternative of burying the rubble, and knowing that if the architect would not allow them to bury it, Mixon Contracting was still the low bidder for hauling it away, and knowing this was a rush job,

said: "Well, one way or the other, we need to get our equipment ready to go to work"; and according to Strickland, Sasser said: "Yes."

That night, Monday, Strickland made his employees close down a Mixon job in South Carolina and return to Waycross; he hired two additional workers, set about to repair equipment in readiness, and arranged to supply a performance bond. However, he waited in vain to find out which way the architect wanted Mixon to do the work, and he learned on Wednesday that Sasser had awarded the job to Dixie Concrete Services. Feeling much aggrieved, Mixon filed this action. In point of fact, Dixie, with a bid of $27,185 buried the rubble on site in three pits 420-500 feet from the existing structure. As to the reason he called Dixie the day after Roger Strickland gave him Mixon's bid, Sasser said he grew concerned that Mixon was going to use dozers to push the rubble to the pit and called Dixie and got a bid from Dixie to use front end loaders to pick it up and haul it away. He also denied that he ever told Roger Strickland the rubble had to be buried within 500 feet and denied he told Strickland he was going to ask the architect if 500 feet were acceptable for burial.

Out of all this testimony, we think it is not proved beyond any genuine issue of material fact that Sasser accepted Mixon Contracting's bid to do the work (burying or hauling) or that a contract was formed.

In an important respect, Sasser's own testimony is contradictory. He testified that when Dixie called in only a base bid for hauling away the rubble, he understood this was only part of Dixie's bid, and he thought Dixie said they "did not have [the alternate bid] ready yet"; and that he told Roger Strickland that Dixie "had not given me their [other] bid." He testified Dixie did not say they would not bid on burial on site but merely that Dixie "had reservations." But Sasser also testified he told Roger Strickland, when he showed Strickland Dixie's base bid for hauling the rubble away, that Dixie would "rather not do the work [by burial on site]" or "preferred not to do the work that way."

The conclusion is not inescapable that Sasser accepted Mixon Contracting's bid. If he said and indicated everything that Roger Strickland testified Sasser said, we think a contract might have been formed to do the work "one way or the other"; but Sasser denies all this and testified he merely said: "[I]'ll be in touch." Even assuming Sasser told Strickland that Mixon was the low bidder as to hauling and Dixie would not be submitting an alternative bid at all, if everything else Sasser says is deemed true, nothing bound him absolutely to accept Mixon's bid, and the circumstances alone do not amount to an acceptance and the formation of a clear, unequivocal contract. See *Harry Norman & Assoc. v. Bryan*, 158 Ga. App. 751, 752-753 (282 SE2d 208). The evidence does not prove fraudulent representation

beyond any issue of material fact. In the end, it is a matter of whose version of the events is correct, and this is a jury question.

Accordingly, the trial court did not err in denying summary judgment both to Mixon Contracting and to defendants Robert Sasser, Heritage Realty, Inc. and Pickering Corp., N.V. on Mixon's claims of breach of contract and fraudulent misrepresentation.

2. In appeal 73269, Sasser, Heritage Realty and Pickering Corp. complain of the trial court's grant of summary judgment to Mixon Contracting on their counterclaims. In these Sasser et al. counterclaimed for Mixon Contracting's having brought a frivolous action, obtaining an illegal restraining order, and causing publication in the local newspaper of the lawsuit and restraining order, all being done solely for the purpose of harassing defendants and damaging their reputation. Sasser et al. contend that their counterclaims are viable as a part of the underlying action under the recent law-making decision of *Yost v. Torok*, 256 Ga. 92, 96 (344 SE2d 414), where it was held a party may counterclaim for abusive litigation where the other parties' claim or defense involves, inter alia, "such a complete absence of any justiciable issue of law or fact that it reasonably could not be believed that a court would accept the asserted claim, defense, or other position."

Suffice it to say, from the exposition we have given of the evidence, Mixon Contracting's action is not founded upon "such a complete absence of any justiciable issue of law or fact that it reasonably could not be believed that a court would accept the asserted claim . . ." and hence the defendants cannot make such a counterclaim as part of the underlying action. Id., p. 96.

The remaining ground of appeal 73269, that the denial of summary judgment to defendants on Mixon's claim was error, is disposed of in Division 1 above.

3. In cross-appeal 73270, Mixon Contracting complains of the denial of its motion for summary judgment on its claims, which is disposed of unfavorably in Division 1 herein; and complains of the partial denial of its motion for summary judgment as to its entitlement to punitive damages. The decisions in *Hulsey Pool Co. v. Troutman*, 167 Ga. App. 192 (306 SE2d 83); *Marriott Corp. v. American Academy of Psychotherapists*, 157 Ga. App. 497 (277 SE2d 785) and *W. H. Mulherin Constr. Co. v. Betterton*, 135 Ga. App. 223 (217 SE2d 454) do not, as Mixon contends, stand for a proposition that the fraud constitutes a tort that will authorize punitive damages. These cases involve actions on a contract in addition to actions for tort; and the tort action, not the contract action, is what sustains punitive damages in those cases. OCGA § 13-6-10.

The issues in appeal 73273 where Mixon Contracting filed erroneously and redundantly as "cross-appellant," are the same as those in

appeal 73270, and are disposed of by the ruling in this Division.

4. In appeal 73271 and redundantly in appeal 73272, Pickering Corp., as appellant, complains of the denial of its motion for summary judgment. This issue is decided adversely to Pickering Corp. in Division 1, supra. Pickering Corp. contends further that the trial court erred in denying its motion for summary judgment which urged that it would not be liable for its agent's wilful trespass, (i.e., for Sasser's fraud) under OCGA § 10-6-61, which provides: "The principal shall not be liable for the wilful trespass of his agent unless done by his command." However, this code section must be construed in pari materia with § 10-6-60: "The principal shall be bound for the care, diligence, and fidelity of his agent in his business, and hence he shall be bound for the neglect and fraud of his agent in the transaction of such business." The distinction is that under this latter code section, the principal is liable for fraud or neglect of his agent "in the transaction of [the principal's] business." The "assent" of the principal which under § 10-6-61 binds him to the wilful trespass is deemed to exist implicitly where the act was "in the transaction of [the principal's] business," which is the allegation in this case. There is no conflict in these two statutes. Compare *Gomez v. Great A&P Tea Co.*, 48 Ga. App. 398 (172 SE 750).

Pickering Corp. advances *King v. Citizens Bank of DeKalb*, 88 Ga. App. 40 (76 SE2d 86), but that case concerns wilful malicious acts outside the scope of employment. Moreover, and in any event, our courts long ago "exploded" the theory that a master is not liable for the wilful acts of a servant by which he in his personal malice or wilfulness ceases for a time being to act in the master's service. *Bricks v. Metro Ambulance Svc.*, 177 Ga. App. 62, 68 (338 SE2d 438).

*Judgments affirmed. Banke, P. J., and Sognier, J., concur.*

DECIDED JANUARY 6, 1987 —
REHEARINGS DENIED FEBRUARY 5, 1987 AND FEBRUARY 10, 1987.

*J. Baker McGee, Jr.*, for Sasser et al.
*C. Deen Strickland, Michael D. DeVane*, for Mixon.
*Daniell S. Landers, Terry A. Dillard*, for Pickering.