A89A1494, A89A1495. GORDON et al. v. FROST et al.; and vice versa.
(388 SE2d 362)

BEASLEY, Judge.

This appeal and cross-appeal follow a jury trial in this suit by Mr. and Mrs. Gordon against Thrift Drug Company d/b/a Treasury Drug, pharmacist Frost, and pharmacist/manager Benton, alleging in-

tentional infliction of emotional distress, malicious prosecution, false imprisonment, negligence, and loss of consortium as a result of Mrs. Gordon's arrest at the pharmacy for violation of the Georgia Controlled Substances Act by fraudulently attempting to obtain a controlled substance via the telephone, OCGA § 16-13-32.3.

During trial, the court directed a verdict in favor of defendant Benton on all causes of action and directed a verdict for the remaining defendants on the false imprisonment and negligence counts. The jury found in favor of defendants on the cause of action for malicious prosecution but in favor of plaintiffs on their claims of intentional infliction of emotional distress and loss of consortium; the jury returned a verdict for Mrs. Gordon for $200,000 general damages and for Mr. Gordon in the amount of $20,000. Judgment was entered accordingly.

Defendants Frost and Thrift Drug Company d/b/a Treasury Drug moved for judgment notwithstanding the verdict and/or in the alternative, for new trial. The trial court granted the motion for judgment notwithstanding the verdict and denied the motion for new trial.

In Case No. A89A1494, Mr. and Mrs. Gordon appeal the judgment in favor of defendants notwithstanding the verdict, contending that there was sufficient competent evidence before the jury to support the verdict in their favor and that judgment for defendants was not demanded as a matter of law. In the alternative, they cite error in the court's direction of verdicts during the course of trial, its consequent refusal of requests to charge on the theories of recovery removed from the case, and the court's alleged undue emphasis in charging the jury on the element of lack of probable cause in regard to the claim of malicious prosecution. In Case No. A89A1495, Frost and the drug company cross-appeal the denial of their motion for new trial on the general grounds.

### Case No. A89A1494

1. "'As with a directed verdict, a motion for judgment notwithstanding the verdict is proper only where "there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict." . . . [OCGA § 9-11-50 (a).] [Cits.]' [Cit.] In applying this standard, [the appellate court] must view the evidence in a light most favorable to the party securing the jury's verdict. [Cit.]" *Hiers-Wright Assoc. v. Manufacturers Hanover Mtg. Corp.*, 182 Ga. App. 732 (2) (356 SE2d 903) (1987). See also *Pendley v. Pendley*, 251 Ga. 30 (1) (302 SE2d 554) (1983).

Viewing the evidence in the light most favorable to plaintiffs, it

showed the following. On March 17, 1986, Mrs. Gordon awoke with a migraine headache. After unsuccessfully attempting to sleep it away, she decided to take some prescribed Fiorinal #3 with Codeine. The doctor had given Mrs. Gordon four such prescriptions, two or three of which had been refillable. Mrs. Gordon would go about refilling prescriptions by telephoning the Treasury Drug store where she had been a customer for over four years. During that time Mrs. Gordon had had to have numerous prescriptions filled at the drug store for a variety of suffered conditions, including the migraine headaches. She was on a first-name basis with store pharmacists Benton and Frost and recognized their voices on the telephone. Mrs. Gordon believed that the pharmacists recognized her voice as well because they would refer to her by her first name when she called. Frost had known Mrs. Gordon for over two years and had filled such a Fiorinal prescription for her on several occasions.

When Mrs. Gordon went to take the Fiorinal for her headache, she discovered that she had no medication left and called the drug store to obtain some. An assistant/intern pharmacist, whose voice Mrs. Gordon did not recognize, answered the telephone. Mrs. Gordon stated, "I am calling to renew a prescription for Gail Gordon." The intern asked the name of the prescription and the prescribing physician and Mrs. Gordon responded accordingly. The intern then asked if the prescription was refillable or renewable. Mrs. Gordon responded that she did not know. The intern asked how many pills had been prescribed and Mrs. Gordon requested that the intern hold on while she got the empty prescription bottle. Mrs. Gordon brought the pill container with her to the telephone, read off that twelve pills had been prescribed and responded further to the intern's question about dosage. When Mrs. Gordon was asked to supply the doctor's "DEA number (Drug Enforcement Administration)" she responded she did not have that information, told the intern to call the doctor's office to get the DEA number from one of the nurses, and supplied the prescribing physician's telephone number.

The intern pharmacist informed Mrs. Gordon that they could not fill the prescription without the doctor's DEA number and put her on hold. The call was taken over by pharmacist Frost, whose voice Mrs. Gordon recognized. Frost reiterated that they could not fill the prescription without the DEA number. Mrs. Gordon again stated that she did not have the number, that it should be gotten from the doctor's office, and that she had given the doctor's telephone number to the woman she had first spoken with. Frost told Mrs. Gordon that the pharmacy was very busy and they would do the best they could, but that it would take awhile. Mrs. Gordon thanked Frost and ended the call. At no time during the conversation with the intern and Frost did Mrs. Gordon say she was calling from the prescribing physician's of-

fice. Nor was she asked her identity or if she was calling from the doctor's office.

In Frost's experience, it was not unusual for an employee of a doctor's office to call in a prescription for the doctor without realizing it required a DEA number. Apparently believing that the caller requesting Fiorinal was a representative from Mrs. Gordon's physician's office, Frost called the doctor's office to inquire about the prescription but everyone at the office was out to lunch.

Approximately two hours later, Mrs. Gordon called the pharmacy, identified herself and asked whether or not her prescription was ready. She was told that it would be ready in a couple of minutes, by the time of her arrival. In the meantime, Frost spoke with the prescribing physician's office and learned that no one from the office had recently prescribed Fiorinal #3 with Codeine for Mrs. Gordon. Frost did not inquire further as to whether or not the doctor would have permitted the prescription, did not check the store computer to see the status of the Fiorinal prescription, and did not call Mrs. Gordon to attempt to clarify the situation. Mrs. Gordon's physician did not believe Mrs. Gordon abused the prescribed medications and probably would have refilled the Fiorinal prescription.

Prior to this incident, Frost had stated to the intern pharmacist that Mrs. Gordon was a hypochondriac and took a lot of medication. After learning that the initial call had not come from the doctor's office, Frost reached the conclusion that Mrs. Gordon was attempting to fraudulently acquire the prescription. Consequently, Frost called the DEA to report her suspicion. The DEA told Frost they would send someone to take care of the situation and instructed her to try to keep Mrs. Gordon at the store.

Mrs. Gordon arrived at the pharmacy, identified herself to the intern and stated that she was there to pick up her prescription. She was told she would have to wait. She spoke briefly to Frost about some other medication that Frost had sold her the week before. Shortly thereafter, a police officer arrived and arrested Mrs. Gordon for violation of the Georgia Controlled Substances Act.

Mrs. Gordon was shocked, upset, and hysterical, and at first could not understand why she was being arrested. She asked to contact her husband and her physician. Another customer observed Mrs. Gordon's distress, her being yelled at by the police officer, and her pleas to contact her husband and doctor. During this time, Frost went back behind the pharmacy counter to wait on customers. At least one of the pharmacists spoke with Mrs. Gordon's doctor, and Mr. Gordon arrived on the scene and attempted to assist in straightening out the situation.

The pharmacists informed the officer that they would prosecute and Frost signed a "Citizen's Arrest Form." Mrs. Gordon was taken

to jail and remained there for eight or nine hours. She was finger-printed, photographed, and handcuffed. Following a preliminary hearing and pursuant to Frost's suggestion, a narcotics division detective subpoenaed a computer list of all prescriptions obtained by Mrs. Gordon from the drug store. Frost assisted the detective by going over the list and underlining the "hypnotics." The detective gave the list to the magistrate because the detective knew the magistrate was contemplating dismissing the case. Ultimately, the assigned assistant district attorney determined not to present the case to the grand jury.

"The tort of intentional infliction of emotional distress is recognized in this state, where the 'defendant's actions were so terrifying or insulting as naturally to humiliate, embarrass, or frighten the plaintiff.' [Cit.] 'Claims for intentional infliction of emotional distress have been upheld by this court when the threats on which those claims were based were outrageous and egregious.' [Cit.]" *Arrowsmith v. Williams*, 174 Ga. App. 690, 692 (3) (331 SE2d 30) (1985). "[T]he conduct . . . must be of such serious import as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." *Moses v. Prudential Ins. Co. of America*, 187 Ga. App. 222, 225 (369 SE2d 541) (1988). The plaintiff's burden is a stringent one in order to prevail in such a cause of action. *Bridges v. Winn-Dixie*, 176 Ga. App. 227, 229 (1) (335 SE2d 445) (1985).

Some claims as a matter of law do not rise to the requisite level of outrageousness and egregiousness. See *Sossenko v. Michelin Tire Corp.*, 172 Ga. App. 771, 773 (324 SE2d 593) (1984). Others raise circumstances which properly put the issue before a jury. See, e.g., *Anderson v. Chatham*, 190 Ga. App. 559, 566 (8) (379 SE2d 793) (1989). Once the evidence shows that reasonable persons might find the presence of extreme or outrageous conduct, the jury must find the facts and make its own characterization. See *Chuy v. Philadelphia Eagles Football Club*, 595 F2d 1265, 1274 (9) (3rd Cir. 1979) (1979) citing the Restatement (Second) of Torts § 46, comment h. This is a case of the latter class.

Evidence of a defendant's malicious purpose or of a defendant's wanton disregard of a plaintiff's rights may be considered in evaluating whether or not the objected-to behavior can reasonably be characterized as outrageous or egregious. See *Arrowsmith*, supra at 692 (3). "Comment f, § 46 (1) of the Restatement (Second) states that the extreme and outrageous character of the conduct 'may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.' Moreover, the existence of a special rela-

tionship in which one person has control over another, . . . may produce a character of outrageousness that otherwise might not exist. [Cit.] . . . [However,] 'major outrage in the language or conduct complained of is essential to the tort.'

"The severity of the emotional distress allegedly produced by the conduct is also a factor in determining liability for this tort." *Bridges*, supra at 230 (1).

There was a relationship of professional trust of several years duration between Mrs. Gordon and pharmacist Frost. Frost was in a position of control over Gordon's health and welfare to the extent of properly dispensing needed medications, and as the evidence demonstrated, on occasion making other health recommendations, i.e., advising a non-prescription remedy. Moreover, Frost's position put her in the particular posture of familiarity with Mrs. Gordon's physical and/or emotional state by her ready and continuing access to the lengthy computerized documentation of Mrs. Gordon's prescribed medication in addition to personal exchanges and encounters with the customer relative to her health needs. There was explicit evidence that Frost perceived that Mrs. Gordon had emotional problems, when she expressed her opinion about the quantity of Mrs. Gordon's medications and her hypochondriacal behavior. Because of the pharmacist's special vantage point with regard to Mrs. Gordon's recurring medical condition, the jury could infer knowledge on the part of the pharmacist that Mrs. Gordon would be peculiarly susceptible to emotional distress. Moreover, the evidence was undisputed that on the day of the incident, Mrs. Gordon was already ill prior to the arrest.

In the context of the relationship of trust between this customer and pharmacist, evidence of Frost's previously expressed opinions about Mrs. Gordon, Frost's limited investigation prior to report to the DEA, her actions during and following the arrest, and Mrs. Gordon's version of the circumstances of the initial phone call could have properly been considered by the jury as evidence of Frost's malicious purpose or wanton disregard. Likewise, in assessing liability, the jury could have appropriately considered Mrs. Gordon's extreme distress amounting to hysteria.

Because there was some evidence to support the jury's determination that defendants intentionally inflicted emotional distress upon Mrs. Gordon, the trial court was not authorized to grant the defendants judgment notwithstanding the verdict. While the trial court may act as a "thirteenth juror" before a verdict becomes final insofar as the losing party requires it by a motion for new trial on the general grounds, see *Housing Auth. of Atlanta v. Geter*, 252 Ga. 196, 197 (312 SE2d 309) (1984), it may not assume this role to weigh the evidence, find it in favor of the losing party and thereby grant judgment notwithstanding the verdict.

2. Division 1 renders it unnecessary to consider appellants' alternate enumerations of error.

*Case No. A89A1495*

3. Inasmuch as there was evidence to support the jury's verdict, see Division 1, the trial court's denial of defendants' motion for new trial will not be disturbed. See *Daniels v. Hartley*, 120 Ga. App. 294 (170 SE2d 315) (1969); see also *Smiway, Inc. v. Dept. of Transp.*, 178 Ga. App. 414 (1) (343 SE2d 497) (1986).

*Judgment reversed in Case No. A89A1494. Judgment affirmed in Case No. A89A1495. Carley, C. J., and McMurray, P. J., concur.*

DECIDED OCTOBER 26, 1989 —
REHEARING DENIED NOVEMBER 14, 1989 — 

*John C. Parker, Jennifer H. Chapin*, for appellants.
*Hart & Sullivan, Lawrie E. Demorest, Rush S. Smith, Jr.*, for appellees.