A91A0506. WIDEMAN et al. v. DeKALB COUNTY et al.
(409 SE2d 537)

SOGNIER, Chief Judge.

Toni E. Wideman and Myron Wideman brought suit against, inter alia, DeKalb County, Richard Hameister, Gerald Hart, and Gary Bagley on various claims arising out of an incident that occurred when Toni Wideman was transported in a county ambulance, which the plaintiffs alleged resulted in Ms. Wideman suffering a miscarriage. After numerous pretrial rulings limiting or eliminating several of the counts alleged in the complaint, the case proceeded to trial on Toni Wideman's claims of negligent and intentional infliction of emotional distress and false imprisonment. The trial court directed a verdict in favor of the defendants on all counts except the intentional infliction of emotional distress claim, and the jury rendered a verdict for $250,000 against DeKalb County, Hameister, and Hart. The trial court granted the defendants' motion for judgment n.o.v. or new trial in the event the judgment n.o.v. ruling is reversed, and Toni Wideman appeals.

Construed to support the jury's verdict, the evidence adduced at trial established that as of April 12, 1984, appellant, who was 25 years old and the mother of a one year old boy, was 19 weeks pregnant. During her prior pregnancy, she had experienced difficulties stemming from an esophageal reflux problem, which led to excessive vomiting and dehydration. She was under the care of Dr. John E. Ramsey, an obstetrician and gynecologist based at Piedmont Hospital (hereinafter "Piedmont"), who had been her physician for the prior pregnancy. During the afternoon of April 12, appellant began having stomach pains and a light pink vaginal discharge. She telephoned Dr. Ramsey, who concluded she might be experiencing premature labor and instructed her to meet him in the Piedmont delivery room. Since no family member was available to take her to the hospital, she called the DeKalb County emergency number. A county ambulance staffed

by three emergency technicians, appellees Hart, Bagley, and Hameister (hereinafter the "EMTs"), was dispatched to her apartment and arrived at 4:56 p.m.

The subsequent sequence of events was strongly disputed. Appellant testified she explained to the EMTs that she was having abdominal cramps but no bleeding, and that she needed to be taken to Piedmont where Dr. Ramsey, her regular physician, was waiting. She stated one EMT sarcastically remarked that she needed a doctor closer to home, that they insisted she was bleeding heavily, and that they informed her they intended to take her to Shallowford Hospital (hereinafter "Shallowford") rather than to Piedmont. Evidence was adduced that Shallowford was approximately six miles from her home and Piedmont was about 11 miles away. Appellant testified she never consented to go to Shallowford, that she continued to insist she be taken to Piedmont, that she felt afraid and helpless, and that during the ambulance ride the EMTs were joking in an "uncaring, unfeeling" manner.

Conversely, the EMTs testified that they observed almost two pints of blood on the floor of appellant's bathroom, that she told them she had been bleeding throughout the day and had used six to eight sanitary pads to absorb the flow, and that she was having pains five minutes apart (all of which appellant denied). They testified they determined she needed emergency treatment at Shallowford, and that she agreed with their decision. The EMTs testified they called Shallowford for authorization to start oxygen and intravenous fluids, and that although they could have had their dispatcher connect them with Piedmont and Dr. Ramsey, they elected not to do so because they felt time was of the essence and Shallowford's facilities were adequate (although they did not ascertain whether an obstetrician was available).

The hospital and EMT records reflect that the parties departed appellant's home at 5:14 p.m. and arrived at Shallowford at about 5:20 p.m. Rebecca Watson, a Shallowford emergency room nurse, testified that while the ambulance was en route she received a radio call from the EMTs, who informed her that appellant was hemorrhaging, had low blood pressure and an elevated pulse, and was an emergency patient. Watson testified, however, that when she took appellant's vital signs upon her arrival at Shallowford, they were normal except for an elevated pulse (which medical testimony established could occur in someone who was upset), there was no hemorrhaging or medical emergency, and the records filled out by the EMTs to document their actions were consistent with Watson's findings, not with what they told her in the radio call. Watson testified that appellant was very upset when she arrived, and that she refused to consent to treatment and stated she wanted to be taken to Piedmont. Watson and Dr. William Zeichner, the emergency room physician on duty, exchanged sev-

eral telephone calls with Dr. Ramsey, who they recalled was angry that appellant had been taken to Shallowford and insisted she be sent to Piedmont. Watson stated that there had been no reason to bring appellant to Shallowford to be stabilized, and that since she was in labor she should have been taken to her obstetrician at Piedmont.

Dr. Zeichner, who testified by deposition, stated that nothing in appellant's vital signs indicated a cause for concern, and recalled that when he examined her he found no active bleeding. He deposed he had concluded she would be better off at Piedmont where qualified specialists were available, as he was not trained in the techniques used to stop premature labor, and deposed further that he did not know why the EMTs had brought her to Shallowford. Once he and Dr. Ramsey concurred that she should be taken to Piedmont, Watson and the EMTs engaged in a heated argument concerning whether the EMTs would transport appellant, which they did only after Watson obtained authorization from their dispatcher. The ambulance departed Shallowford at 6:02 p.m. and arrived at Piedmont 20 minutes later.

Dr. Ramsey testified that premature labor can be arrested if treatment begins within two hours, but that by the time appellant arrived at Piedmont she was fully dilated and it was too late to stop her labor. He said she was stable when she arrived, that there was no evidence of excessive bleeding, and that given her blood count it was medically impossible for her to have lost the amount of blood the EMTs claimed. He testified that the EMTs could not reasonably have interpreted her vital signs as indicating a need for stabilization, that there was no justification for the decision to take appellant to Shallowford, and that doing so wasted precious time because he had been available at Piedmont and was well informed about her history and her condition. Dr. Ramsey also stated he became concerned about appellant's welfare after his conversations with the personnel at Shallowford because he ascertained they were not qualified to provide the necessary care.

Appellant and other members of her family testified that she was extremely upset for several days after this incident and despondent for months afterward. Appellant's husband testified that when he first saw her at Piedmont, she was more upset than he had ever seen her to be, that she cried all night, and that the focus of her distress was her belief that she had been mistreated by the EMTs and that something could have been done for her if she had arrived at Piedmont sooner. It was established that appellant had a miscarriage a year later followed by sterilization surgery, but she and her husband testified her emotional distress was not related to these subsequent incidents.

Additional evidence was adduced that the DeKalb County policy

the EMTs were required to follow provided that an ambulance patient must be taken to the hospital of his or her choice. If, however, the patient's condition indicates emergency care is needed and the patient's health could be threatened by a delay, the patient should be taken to the nearest emergency facility, and if the patient refuses to go there, the EMTs must obtain authorization from a physician on duty at that facility. Kenneth Lamoureux, a former DeKalb County EMT, testified that a patient experiencing premature labor who is otherwise stable should be taken to the hospital of her choice because her condition is not life threatening. He opined that if appellant's condition had indeed been as the EMTs described, then "possibly" the decision to take her to the nearest facility was correct, but he stated that such a condition should have been documented on the EMT reports and there was no indication on the reports prepared by the EMTs that such a condition existed.

1. Appellant first contends the trial court erred by granting appellees' motion for judgment n.o.v. on her claim for intentional infliction of emotional distress and by directing a verdict for appellees on her claim of false imprisonment. A directed verdict or judgment n.o.v. may be granted only when there is no conflict in the evidence on any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a particular verdict. *Pendley v. Pendley*, 251 Ga. 30 (1) (302 SE2d 554) (1983). When reviewing the grant of either motion, "we must decide whether all the evidence demanded it, or whether there was some evidence supporting the verdict of the jury. [Cit.] A judgment [n.o.v.] is improperly granted in the face of conflicting evidence, and an appellate court must view the evidence in the light most favorable to the party who secured the jury verdict. [Cit.]" Id. at 30-31 (1).

(a) To establish a claim for intentional infliction of emotional distress, the plaintiff must show that the defendant engaged in outrageous or egregious conduct " 'of such serious import as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress.' [Cit.]" *Gordon v. Frost*, 193 Ga. App. 517, 521 (388 SE2d 362) (1989). Evidence "of a defendant's wanton disregard of a plaintiff's rights may be considered in evaluating whether or not the objected-to behavior can reasonably be characterized as outrageous or egregious. . . . [T]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. Moreover, the existence of a special relationship in which one person has control over

another . . . may produce a character of outrageousness that otherwise might not exist [provided the conduct rises to the level of major outrage]." (Citations and punctuation omitted.) Id. at 521-522.

In the case at bar, the EMTs knew appellant was 19 weeks pregnant. They testified they thought she was in labor, and admitted they understood she was concerned she might be having a miscarriage. The fact that she called for an ambulance showed that she was dependent upon the EMTs to transport her to her obstetrician quickly. In the context of this trust and control, and considering appellant's particular physical and mental condition, the jury was authorized to find that the EMTs willfully violated the county policy concerning the patient's choice of hospital and deliberately disregarded appellant's repeated requests, that they fabricated an alleged emergency to justify their actions, that such conduct was outrageous and extreme, and that appellant suffered severe emotional distress as a result. See id. at 522. Because there was some evidence to support the jury's determination that appellees intentionally inflicted emotional distress upon appellant, the trial court was not authorized to grant appellees' motion for judgment n.o.v. Id.

(b) False imprisonment is defined by statute as "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." OCGA § 51-7-20. Our courts have held that the only essential elements of the tort are the detention and its unlawfulness. *Greenbaum v. Brooks*, 110 Ga. App. 661, 663 (1) (139 SE2d 432) (1964). The restraint used to create the detention must be against the plaintiff's will and be accomplished by either force or fear. *J. H. Harvey Co. v. Speight*, 178 Ga. App. 812, 813 (344 SE2d 701) (1986). " 'The restraint . . . may arise out of words, acts, gestures or the like, which induce a reasonable apprehension that force will be used if plaintiff does not submit; and it is sufficient if they operate upon the will of the person threatened, and result in a reasonable fear of personal difficulty or personal injuries.' [Cit.]" *Greenbaum*, supra. "[A]n individual may be imprisoned 'when his movements are restrained in . . . a traveling automobile . . . or [when he] is compelled to go along with the defendant.' [Cit.]" *Burrow v. K-Mart Corp.*, 166 Ga. App. 284, 287 (3) (304 SE2d 460) (1983).

We are aware of no reported Georgia case involving facts similar to those in the case at bar, but we agree with appellant that analogous principles are set forth in cases involving persons who claim detention occurred because they were deprived of their property by another and would have had to abandon that property in order to depart. Georgia courts have recognized that a jury question is presented in such cases, for "the need to protect one's own property acts as a coercive force in restraining one from leaving. The exercise of dominion over the prop-

erty serves also to exercise dominion over the person owning such property." Id. at 289. Surely the need to protect one's health and to obtain emergency transportation to the physician of one's choice is at least an equally coercive force. Moreover, the uniquely dependent status of an ambulance service patient may be considered to give rise to a circumstance wherein the ambulance personnel assert dominion over the patient so as to restrain the patient from departing the ambulance or refusing the service. "[T]he ambulance is unique as a [common] carrier having exclusive custody of persons . . . who are helpless to protect themselves. No individual is more at the mercy of a carrier than a person . . . ill or injured enough to require [ambulance] carriage." *Bricks v. Metro Ambulance Svc.*, 177 Ga. App. 62, 65 (338 SE2d 438) (1985). Where, as here, a plaintiff needed immediate medical care and had no other means of transportation, and there is evidence that the ambulance personnel disregarded the applicable governmental policy and refused to deliver her to the health care facility of her choice, a jury question is presented on the issues of reasonable fear of personal difficulty and compulsion to go along with the defendants so as to result in a detention within the meaning of OCGA § 51-7-20. As in *Burrow*, supra at 289, the rationale advanced herein "comports with the fundamental purpose and concept of Georgia law which finds false imprisonment in acts which operate upon the will of the person threatened and may result in a reasonable fear of personal difficulty." Although our review of the transcript discloses no evidence of force, there was evidence from which the jury could conclude that restraint was accomplished by acts of appellees which resulted in appellant's reasonable fear of personal difficulty. Although we acknowledge this is a close issue, we cannot find that a verdict for appellees was demanded on the false imprisonment claim, and thus we reverse the trial court's entry of a directed verdict on that count.

2. Contrary to appellant's contention, nothing in OCGA § 5-5-51 modified the pre-existing rule that the first grant of a motion for new trial cannot be disturbed on appeal unless the trial court abused its discretion and the facts demanded a verdict for the appellant. OCGA § 5-5-50. Given that the evidence was in conflict, we do not find that a verdict for appellant was demanded, and thus we will not review the trial court in its first grant of a new trial. See *Holton v. Jones*, 174 Ga. App. 654, 656 (331 SE2d 26) (1985). Consequently, we must address appellant's remaining enumerations because they raise issues that may recur upon retrial.

3. In three enumerations of error appellant contends the trial court erroneously excluded evidence relating to the miscarriage and death of her baby that occurred after she arrived at Piedmont. She made an offer of proof showing that she had a miscarriage, that the baby lived for four hours, that she saw the baby, that there was a

medical possibility that the delivery could have been prevented had she arrived at Piedmont earlier, and that these events exacerbated her emotional distress. Appellant sought to admit this evidence to establish the entire sequence of events during the incident at issue and to show that she suffered emotional distress as a result of her extreme frustration at being delayed by appellees and the ensuing loss of the possibility that the baby could have been saved. The trial judge held that since the wrongful death claim had been eliminated from the action on the basis of governmental immunity, and given that *Ob-Gyn Assoc. v. Littleton*, 259 Ga. 663 (386 SE2d 146) (1989) precluded any claim by appellant for her emotional distress arising from the alleged wrongful death, evidence of appellant's miscarriage and the baby's death was irrelevant and potentially confusing to the jury and therefore inadmissible.

In *Littleton*, the Supreme Court considered the extent to which a woman whose child was delivered but later died allegedly as a result of medical negligence could recover for her own emotional distress. The court held that the mother could not recover for her mental distress over the suffering and death of the baby, id. at 664 (1) and 667-668 (2) (C), and that damages for emotional distress are recoverable only when there exists either negligent conduct resulting in a personal injury to the mother, id. at 665-667 (2) (A, B) or a malicious and willful tort directed toward the mother. Id. at 667-668 (2) (C). In other words, a claim for negligent or intentional infliction of emotional distress is permitted only when the conduct at issue is directed toward or causes injury to the claimant rather than to a third party. Thus, in the instant case appellant was entitled to recover for any intentional acts of appellees that caused harm to her (her claim for negligent infliction of emotional distress having been barred by governmental immunity), but could not assert a claim for any emotional distress she may have suffered as a result of the death of the child or of any tortious acts directed toward the child.

After carefully reviewing *Littleton* and the applicable cases cited therein, we agree with appellant that she was entitled to present evidence of the miscarriage because the emotional distress resulting therefrom was alleged to result from appellees' wrongful acts directed toward her, not from any alleged tortious acts against the baby. This case is distinguishable from *Goddard v. Watters*, 14 Ga. App. 722 (82 SE 304) (1914) (cited with approval in *Littleton*), in which the plaintiff was not permitted to recover for her emotional distress stemming from a miscarriage she suffered after seeing an assault perpetrated upon her husband because there was no physical injury or wanton conduct directed toward her. Here, however, the alleged malicious acts were directed solely toward appellant. Accordingly, she was entitled to seek recovery for any emotional distress causally connected to

this tortious conduct. Evidence of the miscarriage is causally related and thus is admissible because appellant is prepared to show that there were measures that could have been taken to prevent its occurrence had she been taken directly to Piedmont.

The question of admissibility of evidence of the baby's death is more problematic. Although the Supreme Court held in *Littleton* that the mother cannot recover *damages* for her distress over the child's death, the court did not state whether evidence of the death was *admissible* for some other purpose. Evidence is relevant and thus admissible "if it relates to the questions being tried by the jury, either directly or indirectly, tends to illustrate or explain the issue, or aids the jury in arriving at the truth. [Cit.]" *Bituminous Cas. Corp. v. Mowery*, 145 Ga. App. 45, 48 (1) (244 SE2d 573) (1978). We are persuaded that evidence of the child's death is relevant to illustrate the entire sequence of events that transpired as a result of the conduct of appellees and to explain to the jury what happened to appellant. As appellant recognizes, it would be quite confusing to the jury to admit evidence of the delivery of the baby without then explaining what transpired afterward. Of course, the jury must be instructed that they cannot consider any emotional distress resulting from the death. We do find, however, that the trial court did not abuse its discretion by excluding a photograph of the child because the death could be established through testimony, and under *Littleton*, supra at 667 (2) (C), appellant cannot recover for her anguish over having seen the baby.

As the trial court recognized, these distinctions are not simple ones. Nonetheless, the solution is not to conclude, as did the trial court, that any evidence of the miscarriage and death should be excluded because it is confusing, but to do as appellant urged below: admit the evidence relevant to permissible elements of recovery and then instruct the jury that appellant cannot receive damages for her distress over the death of the child, and that her recovery is limited to emotional distress proximately caused by the willful and wanton acts of appellees directed toward her.

4. We find no error in the trial court's decision to admit evidence of appellant's subsequent miscarriage and tubal ligation that occurred a year after the incident at issue. Because appellant presented evidence that she was upset and depressed for a year or more after the encounter with appellees, they were entitled to show other possible causes for that distress.

5. The trial court excluded evidence proffered by appellant through the testimony of Kenneth Lamoureux that in 1982 DeKalb County had a policy of instructing its EMTs to transport patients only to hospitals in DeKalb County in order to keep the vehicles available for service as much as possible and to service the taxpayers of the county. Since Lamoureaux left the employ of the county two

years prior to the incident at issue, and appellant was unable to show that this policy was still in effect in April 1984, the trial court properly excluded this evidence as irrelevant. Contrary to appellant's contention, the doctrine of presumption of continuity (a status when proved to have existed will be presumed to have continued to exist) does not apply here because appellees expressly denied that such a policy existed. See *Strother Ford v. First Nat. Bank*, 132 Ga. App. 268, 270 (208 SE2d 25) (1974).

6. In her final enumeration, appellant asserts the trial court erred by refusing to give her requested charges on the duties owed by common carriers. In *Bricks*, supra at 63-69 (1), this court determined that ambulance services are common carriers, set forth the duties of ambulances in that context, and delineated the instructions to be given to juries in cases alleging negligence or intentional torts by ambulance personnel.[1] *Bricks* established that in a suit alleging the commission by ambulance personnel of an intentional tort, the trial court must charge the jury that the ambulance was a common carrier, id. at 68-69; that as such the ambulance owes a duty to protect its passengers from "insult and injury" and from "injury, violence, insult and illtreatment at the hands of its servants," id. at 67; and that the carrier "is bound to use extraordinary diligence to protect its passengers not only from injury by third persons [cit.], but for wilful and wanton acts of its own servants[, and that i]t is absolutely liable [for such acts], even if the servant was not acting in the interest of the employer in the particular act. [Cits.]" Id. at 67-68. Accordingly, provided that upon retrial substantially the same evidence is adduced, appellant is entitled to have the jury charged in accordance with her requests to charge 9, 11, 14, and 24, and is entitled to a charge on the principle stated in request 12 provided it is properly adjusted to the evidence.

*Judgment reversed. McMurray, P. J., and Andrews, J., concur.*

DECIDED JULY 8, 1991 —
RECONSIDERATION DENIED JULY 24, 1991 — 

Webb, Carlock, Copeland, Semler & Stair, Wade K. Copeland, Wayne D. McGrew III, Davis & Sissel, Kenneth M. Sissel, for appellants.

Greene, Buckley, Jones & McQueen, John D. Jones, J. Russell

---

[1] We note that in *Bricks* one judge concurred in judgment only; however, we have reviewed the portion of that opinion applicable to the issues at bar and find that it correctly states the law.