## 61530. JONESBORO TOOL & DIE CORPORATION et al. v. GEORGIA POWER COMPANY.

BIRDSONG, Judge.

Summary judgment. Jonesboro Tool & Die Corp., appellant herein, established a profit sharing and trust fund for the purpose of benefiting its employees and enhancing their retirement fund. A board of trustees purchased a tract of land for development. The land was subdivided into 73 lots, 68 of which were suitable for building sites. The trustees entered into a contract with the appellee Georgia Power Company wherein Ga. Power agreed to install underground electrical service to the subdivision. The agreement was prepared upon a printed form furnished by Ga. Power and signed by the principal trustee for Jonesboro on April 19, 1973. After execution by Jonesboro, the agreement with accompanying support documents was sent for consideration and approval to the appropriate officer in Ga. Power's office in Macon. That officer later deposed that he examined, approved, and signed the agreement but that this could have been several weeks later than April 19, 1973. By the agreement, Ga. Power agreed to install an underground distribution system for 73 proposed dwellings. However, the basic agreement contained no time as to beginning or completion of the installation of the system. In order to fulfill and clarify the time element for the installation as well as to establish cost factors, a supplemental agreement was executed and made a binding part of the basic agreement. The supplemental agreement, in pertinent part, provided that the owner (Jonesboro) would build homes on the lots within three years from the time the power company commenced installation of the electrical distribution system. The cost of the system was agreed to be $47,118.

The supplemental agreement continued by providing that no later than three years from the *date* of the agreement, the power company would estimate the annual electrical revenue from all homes completed and ready for occupancy. If, using a predetermined factor, the costs of installation of the distribution system exceeded the annual electrical revenue derived from all then completed homes, the owner agreed to pay the difference between the greater installation costs and the lesser annual electrical revenues. Thus, the greater the number of homes completed within the three-year period, the greater the combined revenues and the greater the probability

that the annual consolidated electrical revenues would exceed the cost of construction and relieve the owner from any differential payment.

Three years to the month after Jonesboro indicated its consent to the terms of the agreement by signing it in April, 1973, an audit was made of the annual electrical revenues of the 25 homes completed as of the latter part of April, 1976. The audit disclosed that the 25 homes produced annual electrical revenues that was $18,074 less than the agreed installation cost of $47,118. Ga. Power billed Jonesboro for the $18,074.

Jonesboro showed that consent of the second party to the agreement was not obtained and finalized (by signature of the agent for Ga. Power) until several weeks after the April 19, 1973 date. Other evidence showed that installation of the underground distributions system did not commence until three to five months after Ga. Power had agreed to the contract, or approximately four to six months later. It was further shown that as many as five more houses were ready for occupancy within the next several months after the audit was completed by Ga. Power in April, 1976. It is not clear whether the further electrical revenue from these additional homes would have eliminated the differential or how greatly it would have reduced Jonesboro's obligation to pay any difference between the electrical revenue and the costs of installation.

Ga. Power filed suit against Jonesboro seeking the entire $18,074 deficit as of April, 1976. Jonesboro answered denying any indebtedness; that the contract was too vague and ambiguous to enforce; and that Ga. Power's agent had misled Jonesboro by causing the trustee for Jonesboro to believe that only 12 to 14 homes would need to be completed in order for Jonesboro to be relieved of any obligation to pay the difference in revenues and electrical installation. Ga. Power moved the court for summary judgment which was granted by the trial court. Jonesboro brings this appeal urging that there were issues of fact as to the date of the contract, the intent of the parties, and that there were questions as to enforceability of the contract. *Held:*

We reverse. As we read the total contract in the context of the evidence presented, Ga. Power normally does not charge its customers any installation costs for above ground projects. Because of higher underground costs and the uncertainty that development of subdivisions might be abandoned or underdeveloped, Ga. Power protected itself by requiring the owners to agree to pay for the difference between underground installation costs and total accumulated annual electrical revenues. It also seems clear that the power company encourages builders to utilize electrical power in

their developments by absorbing either the entire cost of underground installation or a pro rata part of the cost of installation of the underground system where either the annual electrical revenues of a development exceed the cost of installation, or will be of sufficient volume to greatly offset those costs.

Viewed from that perspective, the contract, together with the supplemental agreement, in one permissible view, seems to convey that the owner shall have as long a time as possible (up to three years after the installation of the system is commenced) to construct homes on the serviced lots so as to minimize or eliminate the differential in revenues and installation costs. Consistent with that reading, the audit at the end of the three years should not have been conducted until at least August to October, 1976.

Another reading, and the one advanced by Ga. Power, is that the audit should have been commenced three years from the date the contract was signed by Jonesboro, i.e., April 19, 1973. Our difficulty with this interpretation is that the power company admitted that it did not actually approve and sign the contract in acceptance thereof until some weeks after April 19, 1973. The record is not clear as to the actual time the contract was signed by Ga. Power. Thus, we are confronted with at least three possible dates as to when the audit should have been conducted, i.e., three years from the actual date when Jonesboro signed the agreement and offered it to Ga. Power for consideration, approval and execution (April 19, 1973); three years from the date the agreement became accepted by both parties to the agreement (several weeks after April 19, 1973), or in August or September, 1976 (three years after Ga. Power commenced the installation). Because several more houses became ready for occupancy between April and November, 1976, the question as to which date is the beginning of the contract obviously affects the computation of the amount of the differential, assuming that such a differential remained.

Because of the obvious discrepancy and confusion in the effective date of the contract and the importance of that beginning date as the tool for computing the three-year period during which Jonesboro could construct houses thereby increasing the total annual electrical service and reducing the differential between those revenues and Ga. Power's installation costs, we conclude that the provisions of the contract relating to its effective date created real questions of fact. In turn this left serious and substantial questions as to the amount due thereunder to Ga. Power, if any. A jury should have been allowed to determine the intent of the parties as to the effect of the supplemental agreement and its effect on the date of the actual execution of the contract by both parties, and the amount of

damages, if any, based upon the actual inceptive date of the contract. *Weikert v. Logue,* 121 Ga. App. 171, 173 (173 SE2d 268); *Gettier-Montanye, Inc. v. Davidson Granite Co.,* 75 Ga. App. 377, 386 (43 SE2d 716).

The cardinal rule in the summary judgment procedure is that the court can neither resolve the facts nor reconcile the issues, but only look to ascertain if there is an issue of fact. *Bagley v. Firestone Tire &c. Co.,* 104 Ga. App. 736, 739 (123 SE2d 179). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact and if the trial court is presented with a choice of inferences to be drawn from the facts, all inferences of fact from the proofs proffered at the hearing must be drawn against the movant and in favor of the party opposing the motion. United States v. Diebold, 369 U. S. 654, 655 (82 SC 993, 8 LE2d 176); *Lewis v. C. & S. Nat. Bank,* 139 Ga. App. 855, 860 (229 SE2d 765). As we view the facts in this case, Ga. Power has not removed all issues of material facts or reconciled all the disputable issues. Accordingly, the trial court erred in granting summary judgment to appellee.

*Judgment reversed. Shulman, P. J., and Sognier, J., concur.*

DECIDED JUNE 9, 1981.

*James D. Windham,* for appellants.
*C. Crandle Bray, Donald M. Comer,* for appellee.