A96A1289. FISHER et al. v. TOOMBS COUNTY NURSING HOME.
(479 SE2d 180)

PER CURIAM.

Mildred Fisher (hereinafter referred to by her maiden name of Stewart) appeals the trial court's grant of summary judgment to the Toombs County Nursing Home (Nursing Home) on various claims concerning its care and its discharge of T. C. Fisher, allegedly her husband, who was a patient.

On October 31, 1980, Fisher married Stewart in West Palm Beach, Florida. Several years after their marriage, Fisher's health deteriorated, and he was ultimately placed in the Nursing Home in order to be closer to his extended family. Undisputed evidence indicates that Fisher was competent at the time he entered the facility, and he subsequently signed an admissions agreement with the Nursing Home. Stewart agreed to be financially responsible for all expenses Fisher incurred at the Nursing Home that were not covered by Medicaid or other sources. She continued to live in Florida but visited Fisher at the Nursing Home every two weeks until his discharge.

In 1989, Jonathan Fisher, Fisher's son from a former marriage, received court appointment from the Toombs County Probate Court to oversee his father's affairs. The wrong probate court form was used, and the form order named Fisher as the temporary administrator of his father's estate rather than as his guardian. Immediately

after permanent letters of administration were issued, Stewart notified the Nursing Home that she disputed the son's assertion that he was properly appointed as his father's guardian. She filed a petition contesting the appointment, and the appointment was declared a nullity in May 1993.

In February 1992, Fisher broke his elbow when he was dropped by one of the Nursing Home's orderlies, who was transferring Fisher from his wheelchair to his bed. Thereafter, Fisher was discharged and released to his son's care. The Nursing Home did so without informing Stewart. Fisher was moved to a facility in Michigan near his son's home.

Stewart filed the underlying action in four counts: negligence and loss of consortium based upon the injuries Fisher sustained in his fall, breach of contract, and intentional infliction of emotional distress resulting from Fisher's release from the facility without Stewart's knowledge or consent.

The Nursing Home moved to dismiss all counts based, in part, on the assertion that Fisher and Stewart had never been validly married due to an unresolved prior marriage so that she lacked standing to assert the claims of negligence and loss of consortium. The trial court transformed the motion to dismiss into a motion for summary judgment and granted it, based largely on the court's determination that, as a matter of law, the marriage of Fisher and Stewart was invalid.

1. First, Stewart asserts that the trial court erred in determining that her marriage was invalid, thus precluding her standing to pursue the negligence and loss of consortium claims. In addition to other evidence, the Nursing Home filed the affidavit of Louvern Allen Fisher averring that she had married Fisher in June 1950 in Dade County, Florida, and that she "had never undertaken to obtain a divorce" from him. In response, Stewart produced a certified copy of her marriage certificate. Other evidence reflects that Stewart and Fisher considered themselves to be married, e.g., they cohabitated as husband and wife subsequent to their marriage ceremony, and Fisher was insured under Stewart's policy as her spouse.

Marriage being considered a civil contract,[1] its validity will be judged by the law of the forum in which it was made, in this case Florida. *Gen. Elec. Credit Corp. v. Home Indem. Co.*, 168 Ga. App. 344, 349 (309 SE2d 152) (1983) (under the rule of lex loci contractus, the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract

---

[1] "In the eyes of our law, marriage is a civil contract." *Brown v. Ga.-Tenn. Coaches*, 88 Ga. App. 519, 529 (77 SE2d 24) (1953).

was made).

Under Florida law, when one spouse is alleged to have married a second individual while still married to someone else, the subsequent marriage is presumed to be valid. "The presumption in favor of the validity of the subsequent marriage formally entered into is so great that in the absence of competent proof to the contrary it is to be assumed that the previous marriage has been dissolved either by death or legal action." *Grace v. Grace*, 162 S2d 314, 317 (Fla. 1964). This presumption in favor of the second spouse is "one of the strongest presumptions known to the law" and "[w]hile the [party attacking the marriage] is not required to eliminate every remote possibility that a divorce might have been secured by [the spouse in question], it is necessary that [the party attacking the second marriage] tender evidence which when weighed collectively establishes the absence of a reasonable probability that [the spouse in question] actually secured the divorce." *Teel v. Nolen Brown Motors*, 93 S2d 874, 876 (Fla. 1957).

The trial court erroneously determined that Fisher's marriage to Stewart was not valid based on an unresolved prior marriage. A question of fact requiring jury resolution exists as to the sufficiency of the evidence to rebut the strong presumption of validity accorded Stewart's marriage under Florida law. See *Miller v. Miller*, 258 Ga. 168, 170, n. 6 (366 SE2d 682) (1988) (under Georgia law, a jury determines whether a presumption has been rebutted); see also OCGA § 24-4-20 ("[p]resumptions of fact are exclusively questions for the jury"). Accordingly, summary judgment was not warranted on Stewart's claim of negligence and loss of consortium.

2. Second, Stewart enumerates as error the summary judgment on her claim that the Nursing Home breached its contract by discharging Fisher without first contacting her.

An agreement may consist of multiple documents. *Baker v. Jellibeans, Inc.*, 252 Ga. 458, 460 (314 SE2d 874) (1984). The entire agreement at issue in this case consists of (1) the agreement executed by the Nursing Home and Fisher in which he designates Stewart as the "Responsible Party," and (2) the statement of services executed by the Nursing Home administrator and Stewart as the "Responsible Party," whereby she acknowledges understanding the rules and regulations of the Nursing Home. Stewart's health benefits from her job covered Fisher's care in the Nursing Home.

Fisher had wanted to go to the Nursing Home in Toombs County to be close to his other relatives, but Stewart's employment was still in Fort Lauderdale and she maintained her residence there.

By signing this document, Stewart agreed to serve as the Responsible Party, and the Nursing Home's signature indicates its acceptance of her in this role. Stewart also impliedly agreed to abide

by those rules, including the rule that she be financially responsible for Fisher's debts to the Nursing Home. Her agreement to be financially responsible provides her with the "legal interest" in the contract required by OCGA § 9-2-20 (a).

She is not a third-party beneficiary under OCGA § 9-2-20 (b). She is instead a *promisor*, i.e., the "Responsible Party," and Fisher the beneficiary of her obligations under the contract. She thus has privity and standing to sue the Nursing Home. Stewart gave consideration — her promise to be financially responsible for Fisher's care — in exchange for care of her husband and the implied right to have notice of significant actions relating to Fisher which the Nursing Home was taking.

Even if all the benefits of the contract were construed to flow to Fisher, that fact alone would not deprive Stewart of standing. Consideration need not be a benefit accruing to the promisor, but may be a benefit accruing to another. See OCGA § 13-3-42 (d); *Owens v. Svc. Fire Ins. Co. &c.*, 90 Ga. App. 553, 556 (1) (83 SE2d 249) (1954).

The contract implied a duty for the Nursing Home to notify Stewart of Fisher's discharge. An implied term in an agreement exists where it is reasonable and necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they deemed it unnecessary to state. *Ellis v. Brookwood Park Venture*, 161 Ga. App. 242, 243 (288 SE2d 308) (1982). Stewart and the Nursing Home could both reasonably contemplate that she should be notified of Fisher's planned discharge inasmuch as she was both his wife and the Responsible Party under the agreement. "In deciding whether to imply promises or duties to the terms of a contract, ' "(t)he introduction of an implied term into the contract of the parties . . . can only be justified when the implied term is not inconsistent with some express term of the contract and where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties." ' [Cits.] Consequently, though courts are generally reluctant to make contracts for the parties, they will imply promises or duties when justice, good faith, or fairness so demand." (Emphasis omitted.) *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. 148, 149 (1) (304 SE2d 365) (1983) (citing 11 Williston on Contracts, 3rd ed., p. 34, § 1295; 3 Corbin on Contracts, §§ 541, 561). Stewart's situation fits these criteria, and the notice requirement should accordingly be implied in this contract.

As a matter of law, this contract also imposed upon each party a duty of good faith and fair dealing in the performance and completion of their respective duties and obligations. *Toncee, Inc. v. Thomas*, 219 Ga. App. 539, 543 (4) (466 SE2d 27) (1995). "Good faith" is a short-

hand way of saying substantial compliance with the spirit, and not merely the letter, of a contract. *Crooks v. Chapman Co.*, 124 Ga. App. 718 (185 SE2d 787) (1971); OCGA § 13-4-20. A jury could find that the Nursing Home's failure to notify Stewart was not in the "spirit" of the contract and was therefore not in good faith.

The Nursing Home's contention that Stewart was not a party to the contract suggests that it could not have demanded payment of Fisher's debts from her, but there is no indication Stewart could have denied the obligation. Fisher's residence and care were dependent on Stewart's continuing payment for these services. The Nursing Home cannot have it both ways, maintaining on the one hand that for purposes of looking to Stewart for payment, she was contractually obligated as the "Responsible Party," but as to any obligations of the Nursing Home, even those implied terms of good faith and fair dealing imposed under every contract such as giving Stewart notice, no contract existed.

Also unresolved is the effect, on the contract issues, of the probate judge's issuance of letters of administration to Fisher's son while Fisher was still alive; guardianship papers were apparently intended instead. The papers themselves are a nullity, but the fact that some attempt was made to have the son appointed guardian at least raises a factual issue as to Fisher's competence. The Nursing Home administrator maintained that Fisher wanted to leave with his son, but whether he was competent to make that decision is a factual determination not appropriate for summary proceedings. The Nursing Home administrator knew that Fisher had designated Stewart as the "Responsible Party," and that she had agreed to serve in that capacity; she also knew that Fisher's competency was in question. The Nursing Home administrator's deposition testimony, that the probate judge told her that the "guardianship papers" gave the son the power to have the father discharged with or without his consent, is hearsay allegedly relating an ex parte conversation the administrator had with a now-deceased judge.

3. In her third enumeration, Stewart claims that the trial court erred in entering summary judgment on her claim for intentional infliction of emotional distress caused by the Nursing Home's discharge of her husband without her knowledge.

Four elements must be present to support a claim of intentional infliction of emotional distress: "(1) [t]he conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the [plaintiff's] emotional distress; [and] (4) [t]he emotional distress must be severe." (Citations and punctuation omitted.) *Clark v. Arras*, 212 Ga. App. 695, 696 (2) (443 SE2d 277) (1994). "Whether a claim rises to the requisite level of outrageousness and egregiousness

to sustain a claim for intentional infliction of emotional distress is a question of law." *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991).

By all accounts, Fisher was lucid at the time of his discharge and willingly agreed to leave the Nursing Home in the care of his son. While the Nursing Home was aware that Stewart disputed the validity of his appointment as Fisher's guardian, the Nursing Home contacted the probate court that issued the letters to determine their effect. After this contact, the Nursing Home proceeded with the discharge. In light of the above, the trial court did not err in finding that the Nursing Home's conduct in discharging Fisher without Stewart's knowledge lacked the element of outrageousness or egregiousness necessary to support a claim for intentional infliction of emotional distress.

*Judgment affirmed in part and reversed in part. Smith and Ruffin, JJ., concur. Beasley, C. J., McMurray, P. J., Pope, P. J., and Johnson, J., concur as to Divisions 1 and 2 and dissent as to Division 3. Birdsong, P. J., Andrews and Blackburn, JJ., concur as to Divisions 1 and 3 and dissent as to Division 2.*

BEASLEY, Chief Judge, concurring in part and dissenting in part.

I concur fully in Divisions 1 and 2 but respectfully dissent as to Division 3.

The count on intentional infliction of emotional distress also requires jury resolution under the evidence favorable to Stewart. If believed, the nursing home released Stewart's husband after merely calling the probate judge, whose response is rank hearsay and thus not probative. *Sarantis v. Kroger Co.*, 201 Ga. App. 552, 553 (411 SE2d 758) (1991). The nursing home made no further check, gave no notice, and obtained no forwarding address, even though the home knew that Stewart was the patient's wife, that she visited about every two weeks from out of state, and that she was financially responsible for his care.

It is true that "[w]hether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991). But as recognized in that case, in which the Supreme Court reversed the grant of summary judgment to defendant, "If the evidence shows that reasonable persons might find the presence of extreme and outrageous conduct and resultingly severe emotional distress, the jury then must find the facts and make its own determination." Id. In reviewing this case, which is from a grant of summary judgment, we must draw all reasonable inferences against the movant and in favor of the party opposing the motion. *Jonesboro Tool & Die Corp. v. Ga.*

*Power Co.*, 158 Ga. App. 755, 758 (282 SE2d 211) (1981).

There is evidence to support the four elements of the tort, as outlined in the case of *Bridges v. Winn-Dixie Atlanta*, 176 Ga. App. 227, 230 (1) (335 SE2d 445) (1985):

1. The conduct was intentional or reckless in that the nursing home administrator, with full knowledge of Stewart's relationship to the questionably competent elderly patient, did not inform her of the action to be taken or obtain information as to where Stewart could find him. "Heartless" is an apt term accepted in *Bridges*. Id. at 230. Nor did the administrator take proper steps to assure that the person to whom she released the patient was authorized to take charge of him, knowing the patient was not capable of caring for himself.

2. In considering whether this was extreme and outrageous, the relationship of the parties (the nursing home had physical control of Stewart's husband), the defendant's awareness of the victim's particular susceptibility (the nursing home took no steps to inform the patient's wife of his whereabouts), and the severity of the resultant harm (Stewart was not told until she called to check on him that he was gone, and she never saw her husband again once he was removed to Michigan) are appropriate to take into account. *Trimble v. Circuit City Stores*, 220 Ga. App. 498, 499-500 (469 SE2d 776) (1996). The law does not, in the circumstances of this case, preclude the finding that the nursing home's actions were " 'of such serious import as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress.' [Cit.]" (Emphasis in original.) *Gordon v. Frost*, 193 Ga. App. 517, 521 (388 SE2d 362) (1989). For all she knew, her husband may have thought that she abandoned him. "Once the evidence shows that reasonable persons might find the presence of extreme or outrageous conduct, the jury must find the facts and make its own characterization." Id. Some, but not all, claims will be found " 'not to rise to the requisite level of outrageousness and egregiousness as a matter of law.' . . . [Cit.]" *Clark v. Arras*, 212 Ga. App. 695, 696 (443 SE2d 277) (1994); *Yarbray*, supra at 706. Like *Gordon, Yarbray, Trimble*, and *McCoy v. Ga. Baptist Hosp.*, 167 Ga. App. 495, 498-499 (2) (306 SE2d 746) (1983), this is not one of them.

3. Once he was taken to Michigan, Stewart attempted to find him but was unsuccessful. Whether her endurance of this anguish was caused in whole or in part by the nursing home's actions is a jury question, as it cannot be said as a matter of law that the nursing home's actions were not a cause or too remote a cause. See OCGA § 51-12-9; *Jones v. Central of Ga. R. Co.*, 192 Ga. App. 806, 807 (386 SE2d 386) (1989).

4. The severity of the distress is qualitative and quantitative and cannot be precisely measured. Although the nursing home's actions

were not such as would terrify or frighten, a jury could find they were sufficiently insulting as naturally to humiliate or embarrass Stewart. See *Bridges*, supra at 229. As adopted in *Bridges* and in *Yarbray*, supra at 706, emotional distress includes " 'all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.' " *Bridges*, supra at 230, quoting Restatement (Second) of Torts, § 46 (1), comment j. When extreme, it warrants liability. Id.

The evidence thus far developed does not show that Stewart's claim in this count is one of the "fictitious, inflated or trivial claims" against which the court of law must guard by circumscription. See *Moses v. Prudential Ins. Co. &c.*, 187 Ga. App. 222, 224 (369 SE2d 541) (1988).

I am authorized to state that Presiding Judge McMurray joins in this opinion.

DECIDED DECEMBER 5, 1996.

*Lecora Bowen*, for appellant.
*M. Scott Barksdale*, for appellee.