**In the Matter of THOMASTON MILLS, INC., Debtor.**

**No. 01–52544 RFH.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Dec. 5, 2003.

Timothy J. Tracey, and Richard B. Herzog, Jr., Atlanta, GA, for Charles C. Crumley.

Don E. Snow, Thomaston, GA, for Respondents.

### MEMORANDUM OPINION

ROBERT F. HERSHNER, JR., Chief Judge.

Charles C. Crumley, Chapter 11 Trustee (hereafter "Trustee"), filed on June 9, 2003, an Eighth Omnibus Objections to Allowance of Claims. Respondents filed responses on July 1, 8, and 9, 2003.[1] Trustee filed replies to Respondents' responses on August 20, 2003. Trustee's objection came on for a hearing on August 25, 2003. The Court, having considered the objection, the responses, the stipulation of facts, and the arguments of counsel, now publishes this memorandum opinion.

Thomaston Mills, Inc., Debtor, was a textile manufacturer. Debtor operated a number of textile mills. Debtor established a severance plan for its "exempt salaried employees." The effective date of the severance plan was November 1, 2000. The purpose of the severance plan was to provide severance benefits to exempt salaried employees whose employment may be involuntarily terminated due to permanent layoff, unsatisfactory job performance, or following a "change in control."[2]

Debtor was having financial problems when the severance plan was established. Respondents argue that Debtor established the severance plan in order to retain its key employees.

Debtor continued to have financial problems. Debtor's Board of Directors voted on June 14, 2001, to terminate the severance plan effective that date.[3] Debtor, on

---

1. Respondents are thirty-eight former employees of Debtor. Respondents are named in the three responses.

2. *See* Section 1 of the severance plan, a copy of which is attached to the stipulation of facts as Exhibit A.

3. Debtor's Board of Directors also terminated Debtor's retirement, dental, disability, and life

June 14, 2001, sent a notice advising all of its employees that Debtor was permanently closing its textile mills. The notice advised that the severance plan was terminated effective June 14, 2001. The notice also advised that most of Debtor's employees would be terminated on June 16, 2001.[4] Respondents were terminated after June 14, 2001.[5]

Debtor filed a petition under Chapter 11 of the Bankruptcy Code on June 19, 2001. Debtor has liquidated most of its assets and will not reorganize as a going concern. The Court entered an order on March 18, 2002, approving the appointment of Charles C. Crumley as Chapter 11 Trustee.

Respondents have each filed a proof of claim asserting a claim for severance pay under the severance plan. Trustee filed an objection to the proofs of claim. Trustee contends that the claims are for severance pay accruing after the severance plan was terminated. Trustee contends that Respondents' claims should be disallowed.

The severance plan provides that Debtor may, prior to a change in control, permanently suspend severance benefits or terminate the severance plan.[6] Trustee and Respondents disagree on whether the vote by Debtor's Board of Directors to terminate the severance plan was effective. Trustee and Respondents have asked the Court to decide this threshold legal issue before the factual merits of each claim by Respondents is presented.

The severance plan provides in part as follows:

insurance plans.

**4.** *See* Exhibits B and C which are attached to the stipulation of facts.

## THE SEVERANCE PLAN FOR THE EXEMPT SALARIED EMPLOYEES OF THOMASTON MILLS, INC.

### SECTION 1

Introduction

1.1. Purpose. Thomaston Mills, Inc. (the "Company") has established the Severance Plan for the Exempt Salaried Employees of Thomaston Mills, Inc. (the "Plan"). The purpose of the Plan is to provide severance benefits to exempt salaried employees of the Company whose employment is involuntarily terminated by the Company due to a Permanent Layoff, unsatisfactory job performance (as determined by the Company in its sole discretion) or following a Change in Control ("Employees"). . . .

1.2. Effective Date Plan Year. The "effective date" of the Plan is November 1, 2000.

. . .

### SECTION 2

Participation

2.1. Participation in the Plan is limited to those Employees whose employment is involuntarily terminated due to a Permanent Layoff, unsatisfactory job performance or following a Change in Control. . . . No severance benefits are contingent on an Employee's retirement. Severance payments are not to be viewed as automatic and are not compensation for past services, but instead are intended only as prospective payments that will be offered in exchange for a written release from the Employee.

**5.** The Court notes that two of the Respondents may have been terminated prior to June 14, 2001.

**6.** *See* Sections 3.4.5 and 8.1 of the severance plan.

## SECTION 3

### Severance Benefits

3.1.  Eligibility for Severance Benefits

. . .

4.  No severance benefit will be paid to an Employee who terminates employment with the Company until the Employee and the Company have executed a General Release and Separation Agreement ("General Release") providing for the release of all of the Employee's then existing rights and legal claims against the Company and any applicable revocation period has expired without the Employees having revoked the General Release.

. . .

3.3.  Manner and Timing of Payment

Severance benefits will normally be paid in a lump sum after the effective date of a Company-approved release.

. . .

3.4.  Forfeiture of Severance Benefits

. . .

5.  The Company may, prior to a Change in Control, permanently suspend benefits under severance packages in pay status (1) in the event of the Company's insolvency, liquidation, or bankruptcy reorganization or (2) in the event the cost of providing such benefits would lead to the Company's insolvency, liquidation, or bankruptcy reorganization.

. . .

## SECTION 4

### Definitions

4.1.  Change in Control

"Change in Control" means the occurrence during the term of any of the following events:

1.  The Company is merged, consolidated or reorganized into or with another corporation or other legal person, and as a result of such merger, consolidation or reorganization less than a majority of the combined voting power of the then-outstanding securities entitled to vote generally in the election of directors ("Voting Stock") of such corporation or person immediately after such transaction is held in the aggregate by the holders of Voting Stock of the Company immediately prior to such transaction;

2.  The Company sells or otherwise transfers all or substantially all of its assets to another corporation or other legal person, and as a result of such sale or transfer less than a majority of the combined voting power of the then-outstanding Voting Stock of such corporation or person immediately after such sale or transfer is held in the aggregate by the holders of Voting Stock of the Company immediately prior to such sale or transfer;

3.  There is a report on Schedule 13D or Schedule 14D–1 (or any successor schedule, form or report), each as promulgated pursuant to the Securities Exchange Act of 1934 ("Exchange Act"), disclosing that any person (as the term "person" is used in Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) (a "Person") has become the beneficial owner (as the term "beneficial owner" is defined under Rule 13d–3 or an successor rule or regulation promulgated under the Exchange Act) of securities representing 20% or more of the combined voting power of the then-outstanding Voting Stock of the Company;

4.  The Company files a report or proxy statement with the Securities and Exchange Commission pursuant

to the Exchange Act disclosing in response to Form 8–K or Schedule 14A (or any successor schedule, form or report or item therein) that a Change in Control of the Company has occurred or will occur in the future pursuant to any then-existing contract or transaction; or

5. If, during any period of two consecutive years, individuals who at the beginning of any such period constitute the Directors of the Company cease for any reason to constitute at least a majority thereof, provided, however, that for purposes of this paragraph 5 each Director who is first elected, or first nominated for election by the Company's stockholders, by a vote of at least two-thirds of the Directors of the Company (or a committee thereof) then still in office who were Directors of the Company at beginning of any such period will be deemed to have been a Director of the Company at the beginning of such period, but excluding for this purpose, any such Director whose initial assumption of office occurs as a result of an actual or threatened election contest (within the meaning of Rule 14a–1 of the Exchange Act) with respect to the election or removal of Directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board.

Notwithstanding the provisions of the foregoing paragraphs 3 or 4, solely because (a) the Company, (b) the Company or (c) any Company-sponsored employee stock ownership plan or any other employee benefit plan of the Company or any Subsidiary either files or becomes obligated to file a report or a proxy statement under or in response to Schedule 13D, Schedule 14D–1, Form 8–K or Schedule 14A (or any successor schedule, form or report or item therein) under the Exchange Act disclosing beneficial ownership by its shares of Voting Stock, whether in excess of 20% or otherwise, or because the company reports that a Change in Control of the Company has occurred or will occur in the future by reason of such beneficial ownership.

. . .

## SECTION 7

### Miscellaneous

. . .

7.3. **Employment Rights.** The Plan does not constitute a contract of employment and participation in the Plan will not give a participant the right to be rehired or retained in the employ of the Company, nor will participation in the plan give any Employee any right or claim to any benefit under the Plan, unless such right or claim has specifically accrued under the terms of the Plan.

. . .

7.6 **Action by the Company.** Unless otherwise provided herein, any action required of or permitted by the Company under the Plan shall be by resolution of its Board of Directors.

7.7. **Controlling Laws.** The substantive law of Georgia will be controlling except as it may be preempted by the Employee Retirement Income Security Act of 1974.

. . .

## SECTION 8

### Amendment and Termination

8.1. **Amendment and Termination.** The Company reserves the right to amend the Plan from time to time or to terminate the Plan at any time in its sole discretion. Notwithstanding the above, during the one-year period following a

Change in Control no amendment will be made to the Plan that would reduce or eliminate benefits payable under the terms of the Plan immediately prior to the date of the Change in Control. The Plan cannot be terminated during the one-year period following a Change in Control.

■ The severance plan provides that Debtor's Board of Directors may, prior to a change in control, permanently suspend severance benefits or terminate the severance plan. Debtor's Board of Directors voted to terminate the severance plan on June 14, 2001. Respondents argue that a change in control occurred prior to June 14, 2001, because certain banks were telling Debtor's Board of Director's "what to do."

The severance plan, in Section 4.1, states that a change in control means the occurrence of any of the following events: (1) Debtor is merged, consolidated, or reorganized into or with another corporation or other legal person and, as a result of that action, Debtor's outstanding securities no longer have the majority voting power in the new corporation; (2) Debtor sells or transfers all or substantially all of its assets to another corporation or other legal person, and as a result of the sale or transfer, Debtor's outstanding securities no longer have the majority voting power in the new corporation; (3) a Schedule 13D or 14D–1 report is filed pursuant to the Securities Exchange Act; (4) a Form 8–K or Schedule 14A report is filed with the Securities and Exchange Commission, or (5) a majority of the directors on Debtor's Board of Directors change during a two year period.

The severance plan provides that a change in control means the occurrence of any of the five defined events. There is no evidence that events (3), (4), or (5) oc-

curred. There is no evidence that, prior to June 14, 2001, Debtor was merged, consolidated or reorganized into another organization. There is no evidence that Debtor sold or transferred all or substantially all of its assets. Nor is there any evidence that Debtor's outstanding securities did not continue to have the majority voting power. The Court can only conclude that no event occurred which resulted in a change in control.

■ Next, Respondents argue that the last sentence in Section 8.1 of the separation plan is an "incorrect statement of the intent of the parties." The sentence says, "The [Severance] Plan cannot be terminated during the one-year period *following* a Change in Control." (emphasis added). Respondents argue that the sentence should say: "The [Severance] Plan cannot be terminated during the one-year period *prior to* a Change in Control." (emphasis added).

In *Boland v. Georgia Eye Institute, Inc.*[7] the Georgia Court of Appeals stated in part:

"The cardinal rule of contract construction is to ascertain the intention of the parties. OCGA § 13–2–3. Contract construction is a three-step process.... First, if no ambiguity appears, the trial court enforces the contract according to its terms irrespective of all technical or arbitrary rules of construction. That is, where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties. Secondly, if ambiguity does appear, the existence or non-existence of an ambiguity is itself a question of law for the court. Finally, a jury question arises only when there appears to be an ambiguity in the contact which cannot be negated by the

7. 235 Ga.App. 492, 509 S.E.2d 342 (1998).

court's application of the statutory rules of construction.... [A] contract should be construed by examining the agreement in its entirety, and not merely by examining isolated clauses and provisions thereof." (Citations and punctuation omitted.) *Duffett v. E. & W. Properties,* 208 Ga.App. 484, 486(2), 430 S.E.2d 858 (1993).

509 S.E.2d at 344.

The Court is persuaded that the sentence at issue is clear and unambiguous. The sentence is consistent with Section 1.1 which provides, in part, that the purpose of the severance plan is to provide severance benefits to an employee who is involuntarily terminated *following* a change in control. *See also* Section 2.1 (participation in the severance plan is limited, in part, to employees whose employment is terminated *following* a change in control).

■ Next, Respondents argue that Debtor did not act in good faith in terminating the severance plan on the eve of bankruptcy as the business was going under. Respondents argue that they stayed with a struggling business in reliance upon the severance plan. Respondents rely upon *Boland v. Georgia Eye Institute, Inc.,* 235 Ga.App. 492, 509 S.E.2d 342, 345 (1998). ("In Georgia, every contract includes the implied duty of good faith.")

■ "As a matter of law, this contract also imposed upon each party a duty of good faith and fair dealing in the performance and completion of their respective duties and obligations. 'Good faith' is a shorthand way of saying substantial compliance with the spirit, and not merely the letter, of a contract." *Fisher v. Toombs County Nursing Home,* 223 Ga.App. 842, 479 S.E.2d 180, 184 (1996).

■ There "can be no breach of an implied convent of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do. The same rule must apply when good faith is expressly covenanted." *Marathon U.S. Realties, Inc. v. Kalb,* 244 Ga. 390, 260 S.E.2d 85, 87 (1979). *See also Walker v. Gwinnett Hospital System, Inc.,* 263 Ga.App. 554, 588 S.E.2d 441 (2003).

The severance plan expressly states that Debtor may, "at any time in its sole discretion," terminate the severance plan prior to a change in control. The Court is persuaded that Debtor was simply exercising its rights under the terms of the severance plan.

■ Finally, Respondents argue that their rights to severance pay vested prior to termination of the severance plan. Respondents argue that they stayed with a struggling business in reliance upon the severance plan. Respondents argue that Debtor established the severance plan in order to retain its key employees during a period of financial problems.

Trustee argues that under Section 3.1.4., no rights vested under the severance plan until an employee was terminated and signed a general release in favor of Debtor. Trustee argues that Respondents have not signed general releases. Trustee argues that, under Section 2.1, severance benefits are not compensation for past services, but are prospective payments offered in exchange for a written general release.

Blacks Law Dictionary defines severance pay as follows:

> **severance pay.** Money (apart from back wages or salary) paid by an employer to a dismissed employee. ● Such a payment is often made in exchange for a release of claims that the employee might have against the employer.—Also termed *separation pay; dismissal compensation.*

BLACK'S LAW DICTIONARY 1379 (7th ed.1999).

■ "In the absence of a binding contract which provides for severance pay, no right to severance pay exists." *Hosea v. Sohio Petroleum Co.,* 140 Ga.App. 177, 230 S.E.2d 138, 139 (1976).

Debtor's Board of Directors terminated the severance plan before Respondents' employment was terminated. The Court can only conclude that Respondents had no vested interests under the severance plan before it was terminated by Debtor's Board of Directors.

Accordingly the Court must conclude that Debtor's severance plan was terminated on June 14, 2001.

An order in accordance with this memorandum opinion will be entered this date.